# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RICHARD WAYNE JOHNSON,

     Plaintiff,

v.                                     Civ. No. 15-1071 GBW/CG

CITY OF ROSWELL, *et al.*,

     Defendants.

## ORDER GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendants' Motion for Summary Judgment and Memorandum in Support. *Doc. 108*. The Court has reviewed the Motion and related briefing (*docs. 114, 117, 119, 121, 122*), and, being fully advised, will GRANT the Motion for the reasons set forth below.

## I.    BACKGROUND

Plaintiff Richard Wayne Johnson's claims stem from the events surrounding his shooting by Roswell Police Officer Lannoye on October 28, 2013. *See generally doc. 73.* In his Second Amended Complaint, Plaintiff named as Defendants the City of Roswell, Police Chief Phil Smith in his individual and official capacity, and several subordinate officers in their individual capacities. *See id.* Plaintiff brings this action under 42 U.S.C. § 1983, alleging the use of unconstitutionally excessive force in violation of the Fourth

Amendment.  *Id*. at 11-13, 16-18.  Plaintiff also asserts state law claims under the New Mexico Tort Claims Act and the New Mexico Constitution based upon the same underlying factual assertions.  *Id*. at 13-15, 18-26.  In their Motion, all Defendants seek summary judgment on all claims.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'"  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

However, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions.  This is so because qualified immunity is "designed to protect public officials from spending inordinate time and money defending erroneous suits at trial."  *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).  Therefore, when a public official is entitled to qualified

immunity, the entitlement relieves the official from bearing any of the burdens of litigation, including discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). The Supreme Court "has directed the lower federal courts to apply qualified immunity broadly, to protect from civil liability for damages all officers except 'the plainly incompetent or those who knowingly violate the law,'" in order to avoid unduly inhibiting officers in performing their official duties. *Wilson v. City of Lafayette*, 510 F. App'x 775, 780 (10th Cir. 2013) (unpublished) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001)). The qualified immunity standard allows government officials "ample room for mistaken judgments," shielding them from liability for reasonable error. *Applewhite v. U.S. Air Force*, 995 F.2d 997, 1000 (10th Cir. 1993) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Thus, qualified immunity is "applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

When a defendant moves for qualified immunity on an excessive force claim, the burden shifts to the plaintiff to show (1) "that the force used was impermissible (a constitutional violation)[,]" and (2) "that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007); *see also Medina*, 252 F.3d at 1128. This is a "strict two-part test" that must be met before the defendant asserting qualified immunity again "bear[s] the traditional burden of the movant for summary judgment—

showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark*, 513 F.3d at 1222. The Court may address the two prongs of the test in any order. *Pearson*, 555 U.S. at 236.

Determining whether the allegedly violated right was "clearly established" depends on whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quotations omitted). While the plaintiff need not locate "a case directly on point," nevertheless "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Whether the motion for summary judgment is based on qualified immunity or not, the Court decides the motion on the basis of the facts as construed in the light most favorable to the non-moving party. Consequently, it must keep in mind three principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of

fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *see also Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (noting that courts generally "accept the facts as the plaintiff alleges them" when considering whether a plaintiff has overcome a defendant's assertion of qualified immunity at the summary judgment stage). However, "a plaintiff's version of the facts must find support in the record" at the summary judgment stage. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Third, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255. "[T]o survive the . . . motion, [the non-movant] need only present evidence from which a jury might return a verdict in his favor." *Id*. at 257.

### III.   UNDISPUTED FACTS

   A.   On the afternoon of October 28, 2013, Plaintiff was at home and drinking alcohol. UMF 1 and 2.[1]

   B.   At about 7:00 p.m. that evening, Plaintiff's brother-in-law, Mr. Capps, arrived at Plaintiff's home. Earlier, in the afternoon, Plaintiff and Mr. Capps had argued over the telephone. Because of that argument and

---

[1] Citations to "UMF" refer to the Undisputed Material Facts laid out and numbered in Defendants' Motion. *See doc. 108* at 1-3. The citations herein incorporate the evidentiary support cited by Defendant as well as the response to that assertion found in Plaintiff's Response.

because Mr. Capps had pulled a firearm on him in the past, Plaintiff put on his belt holster with his .22 firearm.  UMF 3, 4, 5, 6.

**C.**     While Mr. Capps and Plaintiff were both in the apartment, Plaintiff fired the pistol in the apartment.  UMF 7.

**D.**     After Plaintiff fired his weapon, Mr. Capps suggested they needed to go for a ride, and so they both left the apartment in a car.  UMF. 8.

**E.**     At some point, Mr. Capps parked the car in a parking lot and then hit Plaintiff with Plaintiff's revolver.  Mr. Capps then took the two weapons in Plaintiff's possession at the time – the .22 revolver and a .22 rifle.  UMF 9.

**F.**     Mr. Capps left Plaintiff in the parking lot and told him that he was going to the police station.  UMF 10.

**G.**     While in the parking lot, Plaintiff told Mr. Capps, "I need you to shoot me or I'm going to shoot myself" or words to that effect.  UMF 11.

**H.**     Thereafter, Plaintiff walked to his place of employment where he was told by a co-worker to go to the hospital.  Instead, Plaintiff walked to his home. UMF 12.

**I.**     When Plaintiff arrived home, his wife told him, "You're not right.  Your speech is slurred, other stuff from drinking." UMF 13.

**J.**     After leaving Plaintiff in the parking lot, Mr. Capps went to the Roswell Police Department.  He was covered in blood and indicated that he wanted to report a battery, but he was unwilling to wait to do so.  Mr. Capps then left the Police Department on foot.  UMF 37, 39.

**K.**     Defendant Zavala requested that an officer be sent to find Mr. Capps. Officer Basinas was able to locate Mr. Capps, who related his version of events including that he had an argument with Plaintiff and Plaintiff wanted Mr. Capps to kill him.  UMF 38, 39.

**L.** Roswell Police Department officers were dispatched to Plaintiff's residence to check on the welfare of Plaintiff. The officers who responded included Defendants Lannoye, Zavala and Swantek. UMF 27, 42, 47.

**M.** When Defendant Lannoye was dispatched, he was informed that Plaintiff was possibly intoxicated, that there had been a previous assault and/or battery between Plaintiff and another individual, that Plaintiff was possibly suicidal, that a round had been fired in Plaintiff's apartment earlier in the evening, and that there was a possibility of another firearm still in play at Plaintiff's address. UMF 27.

**N.** When Defendant Zavala arrived at Plaintiff's home, in addition to the general dispatch information, he was aware that Plaintiff had struggled with Mr. Capps at the Waymaker church at an earlier point in the day during which a round had been fired into the church. UMF 40, 41.

**O.** Prior to approaching Plaintiff's home, Defendant Lannoye met with Defendant Swantek and another officer to discuss the situation and how it should be handled. UMF 28.

**P.** After locating Plaintiff's home, Defendant Lannoye looked at all the entries and exits to the apartment and confirmed that no one was present on the patio. UMF 29.

**Q.** After checking the back patio, Defendant Lannoye approached Plaintiff's front door, knocked on the front door and announced, "Roswell Police." UMF 30. The volume of the announcement was much louder than the volume of ordinary conversation. *See doc. 108*, Ex. 2 (belt tape).

**R.** In response, Defendant Lannoye could hear two voices, one male and one female, yelling and approaching the door. UMF 31.

**S.** Inside the home, Plaintiff heard the first knocks at the door. UMF 15.

**T.**     According to Plaintiff, he did not hear the "Roswell Police" announcement because he has bad hearing.  *Doc. 114*, Ex. 3, p. 117:11-25.

**U.**     Instead, Plaintiff thought it was Mr. Capps at the door.  Because Plaintiff believed Mr. Capps to be a person who was violent and had already hit Plaintiff over the head with a weapon that day, Plaintiff grabbed from the closet a loaded Smith & Wesson .38 firearm.  He was both angry with Mr. Capps and terrified of him at the time.  UMF 16, 17, 18.

**V.**     When Plaintiff grabbed the firearm, he was feeling groggy, dizzy and "out of it" due to being hit in the head and somewhat intoxicated.  UMF 18.

**W.**    After the first knock and announcement, Plaintiff stated, "Let's go motherfucker."  Shortly thereafter, Plaintiff said something about "my fucking guns."  UMF 19, 20.

**X.**     Defendant Lannoye then knocked on the door a second time and again announced, "Roswell Police."  UMF 32.

**Y.**     Defendant Swantek heard the "Roswell Police" announcements made by Defendant Lannoye.  UMF 47, 48; *Doc. 108*, Ex. 5, p. 42:25-43:4; 44:3-15; 45:17-46:7.

**Z.**     After the second knock and announcement, Plaintiff began to open the door.  Defendant Lannoye was worried about a crossfire situation with the officers and a potential hostage situation between the male and female inside.  UMF 33.

**AA.**  When Plaintiff opened the door, he held a firearm in his hand and stated, "Where's my shit, motherfucker."  UMF 22; *see also doc. 108*, Ex. 2 (belt tape).[2]

---

[2] Plaintiff notes a dispute on this fact.  *See doc. 114* at 3.  However, he does not dispute that he said it, only that he does not remember doing so.  Nonetheless, the audio recording of the event clearly reflects the

**BB.** When Plaintiff opened the door, his arms were swinging back and forth. Defendant Lannoye observed the firearm in Plaintiff's hand and saw it being raised in the direction of himself and the two officers behind him. Defendant Zavala observed the firearm pointed in his direction, starting in a low-ready position and coming up.[3] Defendant Swantek observed the firearm raised and pointed at him and Defendant Zavala. UMF 23, 35, 44, 49.

**CC.** Defendant Lannoye was carrying a Glock 9-millimeter handgun and a Heckler & Koch MP4 rifle that was placed in semiautomatic single-shot fire mode. Defendant Lannoye feared for his life and the lives of the officers behind him. To stop the threat he perceived, Defendant Lannoye shot Plaintiff with the rifle. UMF 35, 36.

---

statements. *See Scott v. Harris*, 550 U.S. 372, 378-80 (2007); *see also York v. City of Las Cruces*, 523 F.3d 1205-1210-11 (10th Cir. 2008).

[3] Of the four facts (UMF 23, 35, 44, 49) relevant to the position of the firearm and asserted by Defendants to be undisputed, Plaintiff disputes only UMF 44. *See doc. 114* at 3-4. This fact pertains only to what Defendant Zavala observed. In support of UMF 44, Defendants cite to Defendant Zavala's deposition testimony wherein he described the firearm being pointed at him. *See doc. 108* at 7. Plaintiff disputes the characterization in the deposition testimony, claiming that Defendant Zavala's statement to investigators had instead described the firearm in a "low ready position." *See doc. 114* at 4. In support of this assertion, Plaintiff does not provide the statement, but instead cites to the affidavit of his expert, Dewayne Goar. *Id.* In relevant part, the expert's affidavit states that "Roswell Police Department Sergeant Zavala reported (Mr. Johnson) held the gun not directly at him (Zavala) but at the low ready position extended outwards." *See doc. 114*, Ex. 1, ¶ 19 (nb: Plaintiff mistakenly cited to paragraph 8 of the affidavit). This evidence is insufficient to create a material dispute. First, Mr. Goar's affidavit gives no indication of the source of the alleged statement. Without such information, the Court cannot conclude that the statement was indeed made by Defendant Zavala, which would be necessary to make it admissible under Fed. R. Evid. 801(d)(2). *See* Fed. R. Civ. P. 56(c)(4) (affidavits used to oppose a summary judgment motion must set out facts that would be admissible in evidence). Second, Mr. Goar's affidavit does not establish that the statement, if made by Zavala, is an exact quote. The Court notes that, while the sentence is marked with a quotation mark at the beginning, the same is true of the beginning sentence of every paragraph in the expert's affidavit. *See generally doc. 114*, Ex. 1. When a party is disputing a precise point, its evidence must rise to that level of precision. Third and relatedly, Plaintiff does not explain how the "low ready position" is materially different from the description of the position of the firearm contained in Defendant Zavala's deposition testimony. Finally, in response to UMF 35 and UMF 49, Plaintiff has conceded that the firearm was being raised up. *See doc. 114* at 3, 4. For all these reasons, the Court finds that Fact BB above is undisputed.

**DD.** From the time that Plaintiff exited the apartment with the firearm, "in that two[-]second period the officer did what he had to do in shooting Plaintiff." In short, at the moment of the shooting, Plaintiff represented a threat sufficient to merit Defendant Lannoye's use of deadly force against him. UMF 67, 68.

**EE.** Each Defendant officer received at least the standard law enforcement training provided to Roswell Police officers. UMF 51, 52, 53, 54, 58, 61, 62.

**FF.** Each officer was taught to use the appropriate amount of force, as determined by the situation, to protect the officer's life and/or the life of others. UMF 66.[4]

## IV. LEGAL STANDARD FOR FEDERAL CLAIMS

### A. Excessive Force

An excessive force claim arising in the context of an arrest or detainment of a free citizen invokes the protections of the Fourth Amendment's guarantee of citizens' right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The proper application of the Fourth Amendment test of reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others,

---

[4] Plaintiff disputes UMF 66 as "an opinion asserted by Defendant Swantek." *Doc. 114* at 5. First, Defendants did not cite to any statement by Defendant Swantek in support of UMF 66. *See doc. 108* at 10. Instead, they rely on the deposition testimony of Defendant Smith. *Id.* Second, reviewing Defendant Smith's deposition testimony on this point reveals that he was not expressing an opinion about whether the training was appropriate. Instead, he was stating his understanding of the training itself – that is, that the officers were taught to use the amount of force necessary to protect life. *See doc. 108*, Ex. 6, p. 72:16-22. Plaintiff provides no evidence to undermine this assertion and thus it is undisputed.

and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at

396 (these three factors are commonly known as "the *Graham* factors"). Whether a

particular use of force was "reasonable" must be evaluated "from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* This

standard recognizes that because "police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation, the reasonableness of the

officer's belief as to the appropriate level of force should be judged from that on-scene

perspective." *Saucier v. Katz*, 533 U.S. 194, 205 (2001), *receded from on other grounds by*

*Pearson v. Callahan*, 555 U.S. 223 (2009) (internal citation and quotations omitted). This

evaluation is an objective one, requiring inquiry into the legal reasonableness of the

action at the time of the alleged violation, without regard for the subjective motivations

of the defendant. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1196 (10th Cir.

2001); *see also Cortez*, 478 F.3d at 1125 ("An officer's evil intentions will not make a

Fourth Amendment violation out of an objectively reasonable use of force; nor will an

officer's good intentions make an objectively unreasonable use of force constitutional.").

In this case, the officers used deadly force and defend that use based on the

threat posed by Plaintiff. *See doc. 108* at 14-16. In such a circumstance, the

"reasonableness of [an officer's] actions depends both on whether the officers were in

danger at the precise moment that they used force and on whether [the officer's] own

reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (footnote omitted). Officers are permitted to use deadly force if "a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (quotation omitted). "In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors. These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). Nonetheless, a "reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often . . . too late to take safety precautions." *Id*. (quotations and citation omitted). In fact, "officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable." *Jiron*, 392 F.3d at 414.

### B. Municipal Liability

Municipalities cannot be held liable for the acts of their employees under 42 U.S.C. § 1983 on the basis of a *respondeat superior* theory of liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978); *see also Bryson v. City of Okla. City*, 627 F.3d 784,

788 (10th Cir. 2010). Instead, "[a] plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional violation." *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998). In order to meet this burden, a plaintiff must first "identify a government's policy or custom that caused the injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (internal quotations and citation omitted). The plaintiff is then required to show "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Id.* The Tenth Circuit has distilled these requirements into three specific elements: "(1) official policy or custom[;] (2) causation[;] and (3) state of mind." *Id.*

An official policy or custom may take different forms. *See Cacioppo v. Town of Vail, Colo.*, 528 F. App'x 929, 931-32 (10th Cir. 2013) (unpublished). As relevant here, it can include "the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson,* 627 F.3d at 788 (quotations and citations omitted). "In order to prevail on a claim against a municipality for failure to train its police officers in the use of force, a Plaintiff must first prove the training was in fact inadequate. . . ." *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (also listing four other requirements). To do so, Plaintiff must

identify a specific deficiency in the municipality's training program.  *See Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).

## V.    ANALYSIS OF FEDERAL CLAIMS

1.  *Considering only the moment of the shooting, Defendant Lannoye did not violate Plaintiff's constitutional rights.*

At the time Defendant Lannoye fired his weapon, he knew the following facts: (1) Plaintiff was holding a firearm in his hand; (2) Plaintiff had come to the door with the firearm notwithstanding Defendant Lannoye's two announcements of "Roswell Police," (3) the firearm, while pointed at a downward angle, was (from a right-to-left perspective) pointing toward law enforcement officers; (4) it appeared that the barrel of the firearm was moving upward; (5) moments before, Plaintiff had been yelling and cursing at either a woman inside the home or the officers or both; and (6) Plaintiff had earlier fired a round during an argument in his home.  Analyzing these facts through the factors listed in *Larsen*, the Court finds that, as a matter of law, Defendant Lannoye had "probable cause to believe that [Plaintiff] was a threat of serious physical harm to themselves or to others."  *Jiron*, 392 F.3d at 415; *see also Larsen*, 511 F.3d at 1260.  The perceived movement of the gun upward was obviously reasonable to regard as a hostile motion with the weapon.  Each of the three officers located at the front of the home were easily within the range of Plaintiff's firearm.  Finally, the aggressive and vulgar comments Plaintiff made immediately before opening the door, as well as his violent conduct earlier in the day of which the officers were aware, would communicate to any

reasonable officer in Defendant Lannoye's shoes that Plaintiff's manifest intentions were belligerent. Admittedly, the officers did not order Plaintiff to drop his weapon. However, the immediacy with which the events unfolded made such an order impracticable. In any event, that single fact does not overcome the remaining circumstances which demonstrated Plaintiff was an immediate threat to the officers' safety. In fact, Plaintiff does not appear to dispute this conclusion. *See generally doc. 114*. Certainly, his proffered expert on police procedures does not. *See* UMF 67, 68; *doc. 114* at 5.

Considering only the moment of the shooting, Defendant Lannoye was justified in using deadly force and, thus, did not violate Plaintiff's constitutional rights.

2. *There is no evidence that any officer recklessly or deliberately created the need for deadly force.*

Instead, Plaintiff argues that "[h]ad the officers taken the proper approach and followed customary police procedures, they would not have placed themselves in the danger that they faced." *See doc. 114* at 14. As noted above, "the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Jiron*, 392 F.3d at 415 (quoting *Sevier*, 60 F.3d at 699). This rule "is simply a specific application of the 'totality of the circumstances' approach inherent in the Fourth Amendment's reasonableness standard." *Id*. (quoting *Medina*, 252 F.3d at 1132). "Only

events 'immediately connected' with the actual seizure may be considered, and '[m]ere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983.'" *Id.* (quoting *Sevier*, 60 F.3d at 699 & nn. 7–8).[5]  Plaintiff fails to establish liability under this theory.

Plaintiff argues that each of the *Graham* factors weighs against the officers.  *See doc. 114* at 13-15.  However, the manner in which Plaintiff applies the *Graham* factors to this theory is misguided.  For example, he claims that because the officers were conducting only a welfare check, the first factor, which considers the severity of the crime at issue, "weighs heavily against the use of significant force."  *Id.* at 13 (quoting *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)).  But the pertinent question under the "reckless creation of danger" theory on which Plaintiff relies is whether the officers' pre-seizure conduct was unreasonable in light of the fact they were performing a welfare check.  Here, Defendant Lannoye looked around the home, approached the

---

[5] While the consideration of pre-shooting conduct in this fashion is clearly established in the Tenth Circuit, it may be less so from the Supreme Court's perspective.  In *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), the Supreme Court rejected the Ninth Circuit's provocation rule pursuant to which a law enforcement officer may be held responsible for an otherwise reasonable use of force where the officer intentionally or recklessly provoked a violent confrontation through a warrantless entry that was itself an independent Fourth Amendment violation.  *Id.* at 1546-48.  The Court's reasoning in *Mendez* could be viewed as limiting the excessive force analysis to the moment of the shooting.  However, in the single footnote to the opinion, the Court stated as follows:  "*Graham* commands that an officer's use of force be assessed for reasonableness under the 'totality of the circumstances.'  490 U.S., at 396, 109 S. Ct. 1865 (internal quotation marks omitted).  On respondents' view, that means taking into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it.  Brief for Respondents 42–43. We did not grant certiorari on that question, and the decision below did not address it.  Accordingly, we decline to address it here."  *Id.* at 1547, n. *.  Given the Supreme Court's explicit statement that it was not addressing the broader relevance of pre-shooting conduct, the Tenth Circuit's precedents on the matter remain controlling.

front door, knocked and announced himself as a police officer.  This conduct was not the "use of significant force."  On its face, nothing about this conduct seems disproportionate to performing a welfare check.

With respect to the second factor—whether the suspect posed an immediate threat to the safety of officers or others—Plaintiff states that because the officers have not shown that "prior to [Plaintiff] coming out of the door, . . . they were expecting a threat to their safety or to others . . . this factor should also weigh in favor of Plaintiff[.]" *Doc. 114* at 14.  However, it is difficult to understand how Plaintiff's allegedly unthreatening nature prior to exiting the apartment with a firearm in hand would make the officer's pre-seizure conduct unreasonable.

With respect to the third factor, Plaintiff correctly states that "Plaintiff was not resisting arrest or attempting to evade arrest by flight."  *Id.*  Yet again, this fact does not weigh against the reasonableness of the officer's pre-seizure conduct.

While Plaintiff's analysis of the *Graham* factors is not particularly helpful, the core of his argument is that "[h]ad the officers taken the proper approach and followed customary police procedures, they would not have placed themselves in the danger that they faced."  *See id.* at 14.  To support this claim, he relies upon the expert opinion of Dewayne Goar.  *See id.*, Ex. 1.  A review of Mr. Goar's affidavit reveals the following criticisms leveled at the officers' pre-seizure conduct:

a.  No attempt was made by police to telephone either Ms. Johnson or Mr. Johnson.  *Id*., Ex. 1 at 10.

b.  No attempt was made to look into windows or listen to what was being said before Roswell Police took position and knocked on the door.  *Id.*

c.  Police did not use a loud speaker, lights, siren or other methods to attempt to have Mr. Johnson realize it was police wanting to talk to him rather than his brother-in-law coming back to assault him.  *Id.*

d.  Sergeant Zavala "should have known to slow the entire matter down."  *Id*., Ex. 1 at 11.

e.  Officer Lannoye should have known not to exercise a sneak approach in this situation.  *Id.*

f.  "The Officers did not use the best practice for concealment or cover. . . .  [T]hese officers should have remained behind cover and concealment and not have engaged Mr. Johnson until he had surrendered."  *Id.*

g.  Officers Swantek and Longberg "should have known their actions were not the best option available."  *Id.*

h.  "Police approached Mr. Johnson not in the nature of a welfare check but in the nature of an arrest or SWAT action acting in a clandestine manner not wanting Mr. Johnson to know they are there until they are at his door.  This option was not the best action to deploy first.  Their action was the last option that should have been deployed."  *Id*., Ex. 1 at 12.

i.  The officers could and should have learned prior to approaching the apartment that Ms. Johnson was not a hostage.  *Id.*

j.  "In [Mr. Goar's] professional opinion, the Officers failed to follow generally accepted guidelines for the escalation of force.. . .  [T]he Officers should have deescalated the situation.. . .  The Officers did not deescalate the situation, but in fact escalated it to the extent that it required the use of force.  The actions of the Officers demonstrated the failure to follow generally accepted and taught officer safety and use of force guidelines, thus causing them to use force."  *Id*.

Based on these criticisms, Mr. Goar concludes that the officers' "actions were reckless and deliberate and not in the best interests of the public, their fellow officers, and/or themselves."  *Id*.

While the Court cannot judge credibility at this stage, for an expert opinion to be considered in the summary judgment calculus, it must meet the standards of admissibility.  FED. R. CIV. P. 56(c)(4); *see also* FED. R. EVID. 702.  Of significance here, an expert opinion must be based on facts which enable the expert to express a reasonably accurate conclusion.  *See Dodge v. Cotter Corp*., 328 F.3d 1212, 1222 (10th Cir. 2003); *see also Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1060 (D. Colo. 2011).  The facts which underpin Mr. Goar's opinion of recklessness and deliberateness are utterly inadequate to support such an opinion.[6]

---

[6] Defendants have filed a Motion to Strike the Opinions Contained in the Affidavit of DeWayne Goar.  *Doc. 119*.  Rather than "striking" the opinions or affidavit, the Court will consider only those opinions adequately supported as described herein.  Thus, the motion will be denied as moot.

First, Mr. Goar repeatedly refers to the officers' approach to Plaintiff's home as a "sneak approach" done in a "clandestine manner." *See doc. 114*, Ex. 1 at 11-12. He goes so far as to describe it as "not in the nature of a welfare check but in the nature of an arrest or SWAT action." *Id*. at 12. There is no evidence in the record to support such characterizations. Defendant Lannoye walked around and observed the home, approached the front door and then firmly knocked on the front door and announced "Roswell Police." Certainly the mere failure to use bullhorns or sirens prior to approaching cannot transform an approach to a home as "clandestine" or sneaky. In fact, Mr. Goar contradictorily faults the officers for not sneaking up to look into windows or listen to what was being said prior to taking their positions. *Id*. at 10. Consequently, each of Mr. Goar's criticisms based on the factual assertion that the officers took a clandestine approach lack any factual foundation.

Second, Mr. Goar appears to rest his ultimate opinion on his belief that the officers had better options available to them. However, the existence of alternative options that may be considered better in hindsight does not establish recklessness. *See Jonas v. Bd. of Comm'rs of Luna Cty.*, 699 F. Supp. 2d 1284, 1293 (D.N.M. 2010); *see also Cross v. City of Clovis*, 755 P.2d 589, 592 (N.M. 1988). Recklessness requires taking an action entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 68 (2007). In other words, it requires "a known or obvious risk that was so great as to make it highly probable that

harm would follow." *Id.* (quoting with approval W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS § 34 at 213 (5th ed. 1984)).  In this case, Plaintiff would have to establish that the manner the officers approached Plaintiff's door—walking around the house, approaching the front door, knocking and announcing "Roswell Police"—made it highly probable that Plaintiff would respond by precipitating an armed confrontation.  None of the facts underpinning Mr. Goar's opinion makes such a showing.[7]

Third, Mr. Goar's conclusory opinion about recklessness contradicts his earlier report and deposition testimony which only concluded that the officers were negligent. *See doc. 119*, Ex. 1 at 3-6 & Ex. 2 at 13, 15.  Plaintiff makes no attempt to argue that this change is based upon facts Mr. Goar has since learned.  At this time, Mr. Goar's upgrade to the officer's culpability in his affidavit must be disregarded as an attempt to manufacture a sham fact issue. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

At most, Mr. Goar's affidavit could support a finding of negligence on the officers' part.  While the relevance of negligence will be discussed further regarding Plaintiff's state claims, it is plainly insufficient for the federal excessive force claim.

---

[7] In fact, imagining how Mr. Goar proposes the officers should have proceeded evokes the picture of an armed siege of Plaintiff's apartment.  He believes the officers should not have approached the door until they were using loudspeakers, lights and sirens to communicate with Plaintiff. *Doc. 114*, Ex. 1 at 10. Moreover, he believes that they should have remained hunkered behind cover and concealment until Plaintiff "had surrendered." *Id.*, Ex. 1 at 11.  Of course, as Mr. Goar repeatedly notes, the officers were not there to arrest Plaintiff.  Under these circumstances, the Court is unpersuaded that such an approach was a better option, let alone that a reasonable jury could find that not taking such an approach amounted to recklessness.

Based on the summary judgment record, Defendant Lannoye had probable cause to believe that Plaintiff posed a threat of serious physical harm to the officers at the scene. As such, he was justified in using deadly force against Plaintiff. None of the officers at the scene recklessly or deliberately created the need for such force by their pre-shooting conduct. Therefore, Plaintiff has not established a constitutional violation by use of excessive force, and the individual Defendants are entitled to qualified immunity on Plaintiff's First Cause of Action.

3. *The municipal Defendant is entitled to summary judgment on the federal claims.*

"[U]nlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993). However, "a municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Green v. Post*, 574 F.3d 1294 (10th Cir. 2009) (quoting *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)). As described above, the evidence does not support a finding that the individual officers committed a constitutional violation in connection with the shooting of Plaintiff. Therefore, Defendant City of Roswell cannot be held liable under § 1983. Moreover, the summary judgment record reveals no municipal policy which could be said to have caused the shooting in this case. Finally, notwithstanding some conclusory statements by Mr. Goar, Plaintiff points

to no defect in the training or supervising of these officers which could support liability had there been a constitutional violation.  *See Bryson,* 627 F.3d at 788.

For all these reasons, Defendant City of Roswell is entitled to summary judgment on Plaintiff's Third Cause of Action.

## VI.  ANALYSIS OF STATE CLAIMS

### A.  Waiver of Immunity Under New Mexico Tort Claims Act

For Plaintiff to prevail on his state claims, he must establish that governmental immunity has been waived for the claims he presses.  *See Weinstein v. City of Santa Fe,* 916 P.2d 1313, 1316 (N.M. 1996) ("Generally, the Tort Claims Act provides governmental entities and public employees acting in their official capacities with immunity from tort suits unless the Act sets out a specific waiver of that immunity."). Under the New Mexico Tort Claims Act, immunity is waived when a law enforcement officer acting within the scope of his duty commits a tort specified in the statute or a violation of a constitutional or statutory right.  *See* N.M.S.A. § 41-4-12 (1978).  Once it is established that a specific tort or violation of a protected right was committed, governmental actors are also liable if their negligence caused the tort to be committed. *See Weinstein*, 916 P.2d at 1316-23.  Nonetheless, it bears repeating that liability for negligence is only possible if such negligence results in one of the specified torts or a right secured by law.  *See Milliron v. Cty. of San Juan*, 384 P.3d 1089, 1094 (N.M. Ct. App. 2016).

### B. Plaintiff's State Claims Against the Officers Based on Violations of the New Mexico Constitution

In Plaintiff's Fifth Cause of Action, he alleges a violation of a constitutional right under the New Mexico Constitution. *See doc. 73* at 20-25. The right asserted is the right to be free from the use of excessive force. *Id*. at 20. As Plaintiff concedes, "New Mexico law applies a reasonableness standard, much like federal law, to excessive force claims under the New Mexico Constitution." *Doc. 114* at 21 (quoting *Sisneros v. Fisher*, 685 F. Supp. 2d 1188, 1222 (D.N.M. 2010).[8] Applying that standard as described above, the evidence does not support a finding that the individual officers used constitutionally excessive force in connection with the shooting of Plaintiff. Thus, this claim is subject to summary judgment in favor of Defendants.

### C. Plaintiff's State Claims Against the Officers Based on Commission of Specified Tort

Having failed to establish a violation of a state constitutional right, Plaintiff can only fall within the waiver of governmental immunity by showing the commission of a specified tort. *See* N.M.S.A. § 41-4-12 (1978). In Plaintiff's Fourth Cause of Action, he alleges that Defendant Lannoye committed assault and battery against Plaintiff. *Doc. 73*

---

[8] In his Complaint, Plaintiff asserts that the state Constitution provides greater protections than its federal counterpart. *See doc. 73* at 20-25. However, in his briefing, he provides no argument that the state's standard of "reasonableness" in the context of excessive force claims is any different than the federal one laid out above. Indeed, he concedes that the standards are functionally the same. *See doc. 114* at 21. To the extent that there is a greater protection under the state constitution against excessive force, it would be that there is no requirement that a plaintiff show an actual non-*de minimis* injury under state law, diverging from some circuit interpretations of the federal constitutional requirements. *See Sisneros v. Fisher*, 685 F. Supp. 2d 1188, 1222-23 (D.N.M. 2010). Given that the lack of such an injury is not the basis for the Court's conclusion on Plaintiff's federal claims, that distinction makes no difference in this case.

at 18-20. In Plaintiff's Second Cause of Action, he alleges that "[a]n assault and battery was perpetrated upon Plaintiff, thereby resulting in his injuries as a result of Defendants Joseph Lannoye, Cruz Zavala and Robert Swantek's negligence in performing their duties. . . ." *Id.* at 15. Assault and battery are specified torts under the Tort Claims Act, so Plaintiff's allegations can fall within the waiver of immunity if he can establish that Defendant Lannoye committed those torts. In the summary judgment record, there is insufficient evidence from which a jury might make such a finding.

A police officer is not liable for assault or battery if he acted in good faith and did not use more force than is reasonably necessary under the circumstances. *See State v. Gonzales*, 642 P.2d 210, 213 (N.M. Ct. App. 1982); *see also Jonas*, 699 F. Supp. 2d at 1297. This standard reflects the same underpinnings as the federal reasonableness inquiry. As the New Mexico Supreme Court has explained,

> Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace. When acting in good faith, the courts will afford them the utmost protection, and they will recognize the fact that emergencies arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court.

*Mead v. O'Connor*, 344 P.2d 478, 479-80 (N.M. 1959). When courts apply this privilege under New Mexico law for the use of force by law enforcement officers, their analysis mirrors the Fourth Amendment analysis described above. *See Youbyoung Park v. Gaitan*, 680 F. App'x 724, 744 (10th Cir. 2017) (unpublished); *see also Fancher v. Barrientos*, 2012 WL 12838429, at *18 (D.N.M. 2012) (applying same analysis of Fourth Amendment

excessive force claims to New Mexico state assault and battery claims); *Martin v. Cty. of Santa Fe*, 2014 WL 11398752, at *10-*11 (D.N.M. 2014) (same); *State v. Ellis*, 186 P.3d 245, 250-54 (N.M. 2008) (adopting federal objective reasonableness standard for excessive force in context of self-defense claim).  Therefore, having concluded that as a matter of law, based on the summary judgment record, Defendant Lannoye acted reasonably, the Court also concludes that he did not commit an assault or battery against Plaintiff under New Mexico law.  Without sufficient proof of this tort, Plaintiff's Second and Fourth Causes of Action are subject to summary judgment in favor of Defendants.

### D.  Plaintiff's State Claims Based on Supervisory or Vicarious Liability

Plaintiff's Sixth and Seventh Causes of Action allege that Defendant Smith and Defendant City of Roswell negligently supervised the individual officers at the scene or are otherwise vicariously liable for the shooting of Plaintiff.  *Doc. 73* at 25-26.  Again, the liability of these Defendants must be premised upon a showing that Defendant Lannoye committed the either tort of assault and battery or some constitutional violation.  *See Caillouette v. Hercules, Inc.*, 827 P.2d 1306, 1310-11 (N.M. Ct. App. 1992); *Methola v. Cty. of Eddy*, 622 P.2d 234, 236-37 (N.M. 1980); *McDermitt v. Corrections Corp. of Am.*, 814 P.2d 115, 117 (N.M. Ct. App. 1991).  As already discussed, Plaintiff has not presented sufficient evidence that a reasonable jury could make either finding.  Therefore, Defendants are entitled to summary judgment on these claims.

### VII. CONCLUSION

Based on the summary judgment record, there is insufficient evidence from which a reasonable jury could conclude that Defendant Lannoye did not act reasonably when he shot Plaintiff. This conclusion includes a consideration of the pre-shooting conduct of the officers. Consequently, no federal or state constitutional violation occurred, nor did Defendant Lannoye commit an assault or battery under New Mexico law. Therefore, each of Plaintiff's claims fails and Defendants are entitled to summary judgment on all claims.

**WHEREFORE**, Defendants' Motion for Summary Judgment (*doc. 108*) is **GRANTED**. All claims not heretofore dismissed are hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**